**UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |  |
|---|---|---|
| **CALGON CARBON CORPORATION and NORIT AMERICAS, INC.,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Court No. 26-02999** |
| **UNITED STATES,** | ) ) ) | |
| **Defendant.** | ) ) ) | |

**COMPLAINT**

Calgon Carbon Corporation and Norit Americas, Inc. (collectively, "Plaintiffs") through their attorneys, allege and state as follows:

**JURISDICTION**

1.      Plaintiffs bring this action pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii).  This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  Plaintiffs contest certain factual findings and legal conclusions in the final results of the United States Department of Commerce's ("Commerce" or "the Department") seventeenth annual administrative review of the antidumping duty order on Certain Activated Carbon from the People's Republic of China (Case No. A-570-904) covering the period of review ("POR") April 1, 2023, through March 31, 2024.  The final results of the Department's review were published as Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2023-2024, 91 Fed. Reg. 21,796 (Dep't Commerce Apr. 23, 2026) ("Final Results"); see also Issues and Decision Memorandum for the Final Results of the 2023-2024 Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China (Apr. 20, 2026) (hereinafter, "IDM").

## STANDARD OF REVIEW

2.    The standard of review applicable in this action is whether the Department's determinations, findings, or conclusions are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## STANDING OF PLAINTIFFS

3.    Plaintiffs are U.S. producers of certain activated carbon, the domestic product that is like the product that was the subject of the challenged administrative review determination. Plaintiffs participated actively in the administrative review and are interested parties as described in section 771(9)(C) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677(9)(C).  Plaintiffs have standing to bring this action under 28 U.S.C. § 2631(c).

## TIMELINESS OF THIS ACTION

4.    The Final Results for the above-referenced administrative review were published in the Federal Register on April 23, 2026 (91 Fed. Reg. 21,796).

5.    This action is commenced by the filing of a Summons and this Complaint dated May 21, 2026 (see ECF No. 1), which are being filed within 30 days of publication of the Final Results.  This action, therefore, is timely filed pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(I), 28 U.S.C. § 2636(c), and Rule 3(a)(2) of the U.S. Court of International Trade.

## STATEMENT OF CLAIMS

6.    The Department's Final Results are unsupported by substantial evidence on the record and are otherwise contrary to law in the following respects:

## COUNT I

7.    Paragraphs 1 through 6 above are re-alleged and incorporated herein by reference.

8.    The Final Results fail to address the merits of two arguments presented by Plaintiffs during administrative briefing. Shortly before issuing the Final Results, the Department

2

instructed Plaintiffs to strike two arguments from their administrative rebuttal brief that responded to the affirmative case brief submitted on behalf of mandatory respondent Ningxia Huahui Environmental Technology Co., Ltd. ("Ningxia Huahui").

9.      Petitioners timely filed their administrative rebuttal brief with the Department on September 24, 2025.  On April 2, 2026, more than six months after the filing of the rebuttal brief and less than three weeks before issuance of the Final Results, the Department issued the first letter rejecting Plaintiffs' rebuttal brief with instructions to remove an argument pertaining to the surrogate value for coal tar.  See Letter titled "Rejection of Petitioner's Rebuttal Briefs Regarding Ningxia Huahui" (dated April 2, 2026).  The Department's letter claimed that Plaintiffs' brief contained improper surrebuttal arguments.  Id. at 1.  Contrary to the Department's claim, however, Plaintiffs' argument responded directly to the arguments raised by Ningxia Huahui in its affirmative brief regarding a correction to the Malaysian import value. Nevertheless, as instructed, Plaintiffs removed a portion of their rebuttal brief and refiled the brief with the Department on April 3, 2026.

10.      The Department then issued a second letter on April 8, 2026, rejecting Plaintiffs' rebuttal brief for a second time.  See Letter titled "2nd Rejection of Petitioner's Rebuttal Briefs Regarding Ningxia Huahui" (dated April 8, 2026).  The second letter claimed that Plaintiffs' rebuttal brief contained improper "new factual information" and "new arguments" regarding an offset to the dumping margin sought by Ningxia Huahui for activated material generated during production.  Id. at 1.  Contrary to the Department's contention, Plaintiffs' rebuttal brief responded directly to the arguments raised affirmatively by Ningxia Huahui and did not present new factual information not already on the administrative record.  Nevertheless, following the

Department's instruction, Plaintiffs struck that portion of the rebuttal brief and refiled the brief on April 9, 2026.

11.    Also on April 9, 2026, Plaintiffs filed a letter expressing disagreement with Commerce's rejection of their rebuttal brief and explaining there were insufficient grounds to require Plaintiffs to remove any arguments from the rebuttal brief.  See Letter titled "Petitioners' Submission of Second Modified Rebuttal Case Brief" (dated April 9, 2026).  Commerce's late-stage rejection of Plaintiffs' rebuttal brief, more than six months after it was filed and less than three weeks before the Final Results, is not justified and indicates an attempt to avoid reaching the merits of these arguments.

12.    The Department's action to require Plaintiffs to strike these rebuttal arguments from their brief is unsupported by substantial evidence on the record, lacked sufficient explanation and justification for the agency's action, and constitutes an unlawful abuse of discretion.

## COUNT 2

13.    Paragraphs 7 through 12 above are re-alleged and incorporated herein by reference.

14.    Between issuance of the Preliminary Results and Final Results, Commerce switched the surrogate value for bituminous coal consumed by mandatory respondent Datong Juqiang Activated Carbon Co., Ltd. ("DJAC") during the production process.  See IDM at 19.  In the Preliminary Results, Commerce relied on Harmonized Tariff Schedule ("HTS") subheading 2701.12 (the provision for bituminous coal) to value bituminous coal consumed by both DJAC and Ningxia Huahui, whereas in the Final Results, Commerce continued to rely on HTS

4

subheading 2701.12 for bituminous coal consumed by Ningxia Huahui but switched to HTS subheading 2701.19 (the provision for "other coal") for bituminous coal consumed by DJAC. Id.

15.    As rationale, Commerce considered the criteria applicable to merchandise classified under HTS subheading 2701.12 and determined those criteria were not met for DJAC in this review period. In its analysis, Commerce examined test samples submitted by DJAC showing that the physical characteristics of the bituminous coal it consumed during the review period has properties that instead qualify it for valuation under HTS subheading 2701.19 (the provision for "other coal"). IDM at 19-21.

16.    Commerce disagreed with Plaintiffs' arguments that the formula DJAC relied on to argue its consumption of bituminous coal should be valued using HTS subheading 2701.19 was incorrect and not supported by the record evidence.  Commerce's analysis of the test reports to reach the conclusion that DJAC's bituminous coal qualified for valuation based on HTS subheading 2701.19 was based on a misreading of the test report contents regarding the physical characteristics of the bituminous coal.  Nor did Commerce address Plaintiffs' calculations demonstrating that the test reports do not support the use of the value for merchandise classified under HTS subheading 2701.19.  The Department's improper assessment of the criteria discussed in HTS subheading 2701.12 and incorrect analysis of the test sample evidence on the record, renders the surrogate value choice for bituminous coal consumed by DJAC unsupported by record evidence.

17.    The Department's valuation of bituminous coal for DJAC in the Final Results is unsupported by substantial evidence.

**COUNT 3**

18. Paragraphs 13 through 17 above are re-alleged and incorporated herein by reference.

19. In the Final Results, Commerce relied on Rani Transport data to value the mandatory respondents' domestic freight expenses. IDM at 27-28.

20. Commerce's conclusion that the Rani Transport data are the best available data on the record was based on a misunderstanding of the record evidence. The IDM states that "{f}reight data from Zong Lian, Sin Nam Ann, Artha Logistics are not available on our record," reflecting Commerce's belief that the data underlying those freight rates was not included in Plaintiffs' surrogate value submission. Id. at 28. This statement is wrong because the underlying data are provided in Exhibit FSV-6B of Plaintiffs' final surrogate value submission, which was filed with Commerce on July 7, 2025. Further, Commerce's mischaracterization of the record evidence was the only rationale the agency identified for not relying on these three Malaysian freight rates submitted by Plaintiffs. Had Commerce properly understood the available record evidence, the agency's analysis should have weighed the merits of each potential source to value foreign inland freight.

21. Further, Commerce stated that although the Rani Transport data were published in 2017, record evidence demonstrates that those data were still current to the period of review. This finding is unsupported by substantial evidence because the evidence Commerce relied on to conclude the Rani Transport rates remain current does not support that conclusion. Indeed, Commerce also used its conclusion that the Rani Transport data are current to disqualify additional transport data from Malaysia from 2020.

22.    The Department's misunderstanding of the supporting data available on the record, and its failure to consider the merits of each potential data source on the record to value foreign inland freight, renders the Department's decision unsupported by substantial evidence.

### COUNT 4

23.    Paragraphs 18 through 22 above are re-alleged and incorporated herein by reference.

24.    In the Final Results, Commerce relied on Turkish import data under HTS subheading 2806.10 to value hydrochloric acid ("HCL"). IDM at 23-24. In the Preliminary Results, Commerce relied on the Malaysian import value under HTS subheading 2806.10 to value HCL consumption. Id. Commerce switched the surrogate value source to Turkey in the Final Results based on its conclusion that the Malaysian import value under HTS subheading 2806.10 was aberrational during the review period. Id.

25.    Commerce's reliance on the Turkish import value under HTS subheading 2806.10 is an unwarranted departure from its use of the Malaysian import value in the Preliminary Results and in prior administrative reviews. In addition, Commerce's conclusion that the import value during the underlying review was aberrational is inconsistent with evidence on the record demonstrating that the value during the underlying review period was not even twice the value in the immediately preceding review and that the volume underlying the Malaysian import value is also commercially significant and reliable. Commerce's statement that the change in surrogate value does not impact the dumping calculation for DJAC (IDM at 24) is also incorrect and not supported by the record and the agency's margin calculations.

26.    Accordingly, Commerce's reliance on the Turkish import value for HCL is unsupported by substantial evidence.

## COUNT 5

27.    Paragraphs 23 through 26 above are re-alleged and incorporated herein by reference.

28.    The Final Results contain two programming errors pertaining to DJAC's dumping margin.

29.    First, in the Final Results, the Department explained that it inadvertently did not include the by-product offset in its preliminary margin calculations for DJAC and that in the Final Results it included "the appropriate language in DJAC's SAS Margin Calculation Program to grant a byproduct offset."  IDM at 32.  The Department's programming language, however, fails to multiply the surrogate value for the by-product by the correct per-unit quantity that DJAC claimed as a by-product offset in field BYPRODUCT in DJAC's consolidated factors of production (FOP) file. See Letter titled "DJAC 2nd Supplemental Sections A, C, and D Response in the 17th Administrative Review of Certain Activated Carbon from People's Republic of China" at Exhibit S2D-12 (July 17, 2025).  To correct this error, the Department should have multiplied DJAC's per-unit by-product quantity by the surrogate value the Department relied on to value the by-product offset.

30.    Second, Commerce failed to convert correctly the Malaysian surrogate value for electricity.  The final margin calculations relied on the electricity rate published by the Malaysian Investment Development Authority's (MIDA) Cost of Doing Business 2023 publication.  Although the surrogate value summary sheet for DJAC lists the source value for electricity as "28.72" and the source unit for electricity as "Ringgit / kWh," the worksheet entitled "Electricity MIDA" shows an industry average electricity tariff of "28.72 sen per kWh" in cell E60, and "0.287 MYR per kWh" in cell E61.  Thus, the source value and unit for

electricity, 28.72 Ringgit / kWh, in the surrogate value summary does not match either of the average electricity tariffs in worksheet "Electricity MIDA." Commerce also applied a conversion factor of "0.001" to the electricity rate of "28.72 Ringgit / kWh," resulting in a surrogate value for electricity of "0.03," however, the surrogate value summary does not report a unit of measure for the converted surrogate value for electricity of "0.03."   The Final Results indicate the Department intended to convert the original source value of "28.72 sen per kWh" in cell E60 in worksheet "Electricity MIDA" to Malaysian ringgit. Accordingly, the conversion factor should be "0.01" instead of "0.001," and the surrogate value for electricity should be "0.287" instead of "0.03."

31.    Both of these errors should be corrected so that the surrogate value for electricity is reflected accurately.

32.    On May 6, 2026, Plaintiffs filed ministerial error allegations with Commerce requesting correction of these two programming errors.  See Letter titled "Petitioners' Comments on Ministerial Errors in DJAC's Final Results Margin Calculations" (dated May 6, 2026).  At the time of filing of this Complaint, Commerce has not yet addressed the ministerial error allegation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)    hold that Commerce's Final Results are unsupported by substantial evidence and are otherwise not in accordance with law with respect to the claims advanced by Plaintiffs in this Complaint;

(b)    remand the Final Results to the Commerce Department with instructions to correct the errors set forth in this Complaint; and

9

(c)    provide such other relief as this Court deems just and appropriate.

Respectfully submitted,


 /s/ John M. Herrmann

JOHN M. HERRMANN
R. ALAN LUBERDA
MELISSA M. BREWER
KELLEY DRYE & WARREN LLP
670 Maine Avenue, S.W., Suite 600
Washington, D.C.  20024
(202) 342-8400

Counsel to Calgon Carbon Corporation and
Norit Americas, Inc.

Dated:  May 21, 2026

10